Ms. Saltzman, I assume you have one of the issues, is that what all these complicated timing breakdowns are supposed to be telling me? Right. So I'll be speaking on behalf of Appellant Kantai on the surrogate country methodology while Ms. Clark will be discussing NREA and byproduct. Commerce has a three-step approach to selecting a surrogate country, and in China cases, the surrogate country is where all the pricing data is sought, and so it becomes one of the most critical decisions in a case is what the surrogate country is. So the statute directs the department to rely on the best available information and also to the extent possible to rely on a country that's economically comparable and a significant producer. So from this, the department has developed this approach. They start first with economic comparability, and that narrows the list, and then they narrow it further with significant production, and that narrows the list of countries, and then what remains, they look at data quality. That's the normal approach. However, the statute doesn't place more emphasis on economic comparability. This approach by the department does. And while we don't take issue— You don't—well, you were about to say—I was going to ask you if you took issue with the serial nature of the Commerce's inquiry. Right. You don't take issue with that, do you? No, we're not saying—I mean, the practicality, take that approach, and the department needs to have a way that they normally address this. Our issue is that there has to be an exception, and the department says there should be an exception, and the courts have also addressed this, that since the statute doesn't view one of these as more important than the other, you should have all three of these criteria met in the surrogate country. So if approaching it this way is going to end up with a country that's not a significant producer or doesn't have the best quality of information, there needs to be an exception. And so that is what this case is about. Commerce's approach here, essentially, while they say this exception exists, the approach here is essentially a position in which that exception could never exist. So here, we had India versus the Philippines, and the Philippines was lacking in chlorine and in hydrogen, and we also raised other issues with specificity, with the Philippine financial statements. There are major issues in the Philippines. And so our argument was, okay, this is the exception, then. The department should have to consider India. We're not saying that this court needs to decide that India was the best, but there was enough lacking information in the Philippines. This needs to trigger that exception, and the department needs to weigh both countries. And to the extent that the department did address India, they kept going back to the economic comparability. When they looked at the data quality, they said, well, those chemical inputs aren't as high quality because India is less economically comparable. So if that's what this analysis is, then it's conflating economic comparability with data quality, so then there could never be a country that's data quality could overcome economic comparability. It's a circle. And so that's the thing. It seems to me perhaps to be a bit of an overstatement because you could have a country, let's say Lichtenstein, which doesn't produce any chemicals at all, has no factors of production. And clearly it would seem to me in that case, Lichtenstein would be taken out of consideration and maybe India or some other country would be considered. In this case, isn't it the case that commerce didn't say that the economic comparability is the only real question, but they said instead that having passed economic comparability and in the case of India having failed economic comparability, we will then look at whether the data is good enough. And they concluded that it was good enough in the case of the Philippines where you had 38 out of the 40 factors of production present in the Philippines. And you had what they considered to be not an enormous industry, but a substantial production. So one, that the standard isn't good enough, but the best available. And two, that one, India is not, it doesn't not fit that first criteria. It is economically comparable. It's considered less so than the Philippines. So India doesn't not fill one of the criteria. Commerce has decided with the income band that using the per capita income has decided that there is a certain number of countries count as economically comparable. And you're not really fighting that as I read your brief. No, we do. As we discussed that, it's not the most reliable indicator. And so the fact that that's the most important thing we took issue with, but not the general process of the list. So once you start with the idea that China's, that India is off the list, then isn't it just a question of whether the Philippines has a convincing enough case to be made for it being the surrogate country, even if it is not necessarily the ideal surrogate country in the sense that it is the, it has all of the factors of production, it has a huge industry and satisfies that anyone would think that it was sufficient to be the best possible country. Right. I see I'm beyond my time. Can I still take a minute to address the question? We'd say, well, the Philippines is not, I mean, there could be, the Philippines is not a major chemical producer, which is another thing we element. It is lacking in some of the major raw materials. So as much as there may be other, it has some data for chemicals and things the department did rely on, it was lacking in major aspects. And the department prefers to rely on one country for the whole surrogate country method, for one surrogate country, because all of the surrogate values intermix with each other with the financials. They prefer to rely on one country and one that's a significant producer that has the most important inputs. And so if a country we have argued is not as comparable of a producer, doesn't have the most important input for Kong Tai at least, it's financials, it only has one as opposed to five. It doesn't have a specific chemical inputs that, why can't this, this should be the situation the department does consider a country that's less economically comparable. The Philippines is not almost as good. It's a significant difference here. And the statute does not prefer economic comparability over the best available information. That's the best, not just usable. And they don't prefer it over a real significant producer. And India is this, is a large chemical country that the department relied on for years. And that's why they have all of this high quality of information. And the department's not, and this is, keeps happening over and over again. It's not just in this case. It's in other cases where the primary country that's on the list is missing major inputs. And the department won't consider a country outside of the list. They're sticking to this list, even when we're coming up with data issues over and over again. And that's why the department has this exception. It's their own words that surrogate countries that are not at the same level of economic development, but still at a level of economic development comparable, so India, are selected only to the extent that data considerations outweigh the difference in economic development. That's the department's words. They have this exception, but it never gets used. And so we're saying, like, when is it going to get used? Because we want an accurate margin that's based on a country that really fulfills the statutory obligations, the best available information, a real significant producer, and an economically comparable one. I think we should hear from you. Thank you. Thank you, Your Honors. I'm Peggy Clark on behalf of Arch Chemicals. As Ms. Haltzman indicated, I'm going to talk about two of the very fact-specific issues, the choices of surrogate value for urea and the methodology used for two of the four byproduct offsets. With respect to urea, the issue is really whether it should have gone beyond the initial challenge. The Commerce, in its final results, found that there were two possible surrogate values, what is referred to as the BAS price, which is the Bureau of Agricultural Statistics price for retail sales of fertilizer, and the import values for urea, which is a major import. Let me just ask a question that maybe is more procedural. You said that the question is really whether it should have gone beyond the first proceeding. Is that really the question? There may be two quite different questions. One is whether the CIT should have remanded on this issue the first time, and the second is whether the new decision was properly upheld. Both of those things could be true, and we really have only the second question here. That is correct. In fact, there are both issues. No, no, I think I didn't speak clearly. We don't have the question whether the CIT acted erroneously in setting aside the initial decision on this ground of remanding. We have only the question whether the re-decision by Commerce in the remand, which switched positions on this, is now defensible. And on that question, don't we have – tell me why the following is wrong. The record as to urea in the Philippines is astonishingly thin. There's a tiny bit that's suggestive of each position. Why doesn't the government win? There is a small record. There is, in fact, nothing suggestive of domestic production. In the case brief, or in the brief that the government filed with this court, they for the first time cite to some percentages to try to argue that 14 percent of production was domestic. At the CIT, they said 8 percent. But those numbers don't work. They relied on percentages. But in fact, in the record, where they pulled those percentages are the numbers. It says there was 1.7 million tons of fertilizer sold in the Philippines, of which 32 percent was urea. That's 535,000 tons. But there was 8.8 million imports of fertilizer, of which 30 percent was urea, or 2.6 million tons. In other words, there was far more imports of urea than there were sales of urea as fertilizer. And in fact, we're not talking fertilizer, we're talking chemical use, but we're dealing with a fertilizer, which is called fertilizer. So if that's their support for why it's reasonable to infer that there was domestic production, why is it reasonable to infer that there was domestic production? They haven't cited anything. Their only citation is, well, there's no statement that says there was no domestic production. But there is a statement that says urea is imported, ammonium sulfate is both imported and produced domestically, and phosphatic fertilizers are produced domestically. All one sentence. If urea was produced domestically, wouldn't they have said it there? The rest of the evidence that discusses domestic production never mentions urea. Urea is only discussed in terms of imports. So there's no basis. You can't just conjecture that there might be urea production. This wasn't discussed in the briefs, and it may not be legally particularly pertinent, but just out of curiosity, what's the effect on the dumping margin from going from GTA to BAS? It is different for the two companies. I don't know exactly what it was for Cang Thai, but for Jehang, it was 20 percentage points of the margin. 20? It went from 30 to 50. I see. Mm-hmm. OK. You want to talk briefly about your second issue? Now byproduct, yes. In the few seconds I have left. Here again, Commerce changed its methodology between the prelim and the final. Our issue and concern has been that Commerce has never stated a reason supported with a rational relationship to the facts as to the justification for that. So my understanding is this. They said, we're going to look at the product that the two byproducts make, namely the ammonium sulfate, rather than the two ingredients, the two byproducts coming out. And here's a rational reason. They said the ammonium sulfate is sold for less than the sum of the two ingredients into that if we followed the old method. That cannot be. Why is that irrational? Because they have a capping methodology when that happens. They have a specific practice when that happens. We cited four cases where they even call it their practice. And that is to base, if they're going to cap because a circuit value on a byproduct is too high, then they cap it based on the average of the input value of the values that go into making that byproduct. They did not do that here. They've never explained why that cap was inappropriate. Instead, they just said, we don't have a practice. But if that cap had produced a number that was higher than the ultimate sale price of the ammonium sulfate, why wouldn't that capping process, the traditional capping process, be irrational? I see my time is up. May I answer that? Go ahead. As far as I know, and that is not what the record facts would have been, it would not have produced a number higher. So do you have an idea of what the number would have been, how much lower it would have been than the ammonium sulfate number? Once upon a time, I did. I have to admit today, I did not. All right. Thank you. May it please the court. Appellants challenged Commerce's decision on three issues, the selection of the Philippines as the primary surrogate country, the calculation of a byproduct offset, and the use of domestic prices for the surrogate value for urea, as set forth in the government's papers. And as I will address further here, the Court of International Trade properly sustained Commerce's results on these three issues, and its decision should be affirmed. Turning first to the primary surrogate country issue, appellants' broadest challenge to this issue is essentially an argument that Commerce is required to make a comparison between countries on its list of economically comparable countries and countries that are not on that list. That position has been already squarely addressed by this court in the Dorbess decision and rejected. In that case, the court said that the statute requires Commerce to use data from economically comparable countries to the extent possible. And it concluded that it would therefore be error for Commerce to use data from another non-market economy country, regardless of its economic comparability, without any finding that data from the economically comparable countries were unavailable or otherwise unusable. So that issue has been resolved. And accordingly, all of appellants' broad attacks suggesting that there needs to be that sort of comparison should be rejected. Turning to their narrower challenges to this election of the surrogate country, they- What does Commerce mean by unavailable or unusable, especially the latter? Does that mean that if, again, some country that has just the tiniest industry, that's much smaller, let's say, hypothetically, than the Philippines industry in this case, nonetheless had some modicum of production, that that would be usable? And that, therefore, Commerce would use that country, if it was on the list, in preference to a country that was off the list? Well, I'll answer that, Your Honor. But just to be clear, that language was from the court's decision. It wasn't from Commerce. I thought that was picking up on Commerce's position. But it does support Commerce's position. Well, what is Commerce's position, I guess, is what I'm asking. So in terms of what is, as I understand it, the court is asking about what it means to be a significant producer, essentially. And that's something that the parties have argued about. The appellants often refer to the fresh garlic case for that, and the CIT, which talks about that's a case where the lower court- Well, I understand what the CIT has some opinions on this. But I'm really asking about what Commerce's position is. If Commerce is looking at two countries, does it really say, well, this is usable. It's not unusable. And therefore, we'll go with the country that has this tiny amount of production? Or does it have a different standard? What is Commerce's standard? Well, Commerce has often pointed to other cases where it is just described significant to mean a noticeably or measurably large amount. I think that's the language that comes up in a case called Huan-Chang Kang Thai versus United States. It's a CIT case. And so that is sort of a different position that we have put forward in comparison to the language that the court used in fresh garlic, which the court wasn't bound to. But it was saying that that was a potential way to define it, even in fresh garlic. It wasn't a- I don't think the court meant to bind the government to that description. It was more- Can you clarify something? I think it was Ms. Saltzman who said something about the Philippines did not produce the most important or some of the most important ingredients in the subject merchandise here. Can you elaborate on that? And how does that relate to the 2 of 40, which I think was one of the figures. But then there was also mention, I think, from Ms. Saltzman about a number of the financial factors not qualifying either. Can you take me down from there? I can keep track of all that, Your Honor, but I'll do my best. So I think that- Her argument today is not that crossing India off in general is bad, but that when the Philippines is sufficiently bad as a source of supposedly best available data, then you have to look back at India. Why or why not is the Philippines sufficiently bad as a source of the data in this case? Well, what they are referring to is the fact that Commerce chose Indian data for two of the factors of production, chlorine and hydrogen. And Commerce explained, in response to this argument, that chlorinated isocyanurates require 40 factors of production, and that it did not believe that having to turn to another country for two of the inputs, hydrogen and chlorine, was so critical as to warrant switching India- So she used a phrase, something, she used the word important, I think, to describe the chlorine and, was it hydrogen? Hydrogen. And hydrogen. Can you put a number on that? 5%, namely 2 out of 40, that doesn't sound important. Is there something like those two factors of production account for 96% of the cost of production and the other 38 only remaining four or what? I certainly didn't hear that today, nor do I recall that sort of explanation being given in their brief. So if that were raised- Do you have an estimation separate from what you've seen in the brief? Do you standing here have an idea of how important those two elements are out of the 40? I'm sorry, I don't have a sort of way to quantify that, but I- Well, at one point, commerce seemed to think they were important, I guess, the first time around. And then the second time around, commerce said, well, not so much. We don't think they're important. But neither time did they really fill in much by way of why they thought they were either important or not important. Can you give us some help on that? What was it that made them think the second time around that they weren't really important? Your Honor, I've seen the language that they point to, and it doesn't elaborate beyond the statement that commerce at that time did seem to think that those were important factors and that that might be an issue. Was there anything in the record of that remand that would have led commerce to think that they really had made a mistake the first time in thinking how important they were? No, I think commerce was very clear that, ultimately, it preferred to have quality data on 38 of the factors and that it thought that significantly outweighed having to take data from two countries for the other two factors. And it also explained that reliance on data from two countries is permitted by the statute, which allows commerce to select factors of production from one or more countries. It says that specifically in the statute, doesn't it? It does. That's at 19 U.S.C. 1677 B.C. 4. Can you turn to the other two issues quickly? So on the byproduct question, I think this comes down to, even though you could quite legitimately say, I'm not going to use the ammonia gas and the sulfuric acid directly. I can use the other thing because the price of the ammonium sulfate was too high, that you have something of a tradition of solving that problem through capping. And you haven't given a good reason for not following that tradition here. Right, well, I mean, the parties view it differently as to whether commerce has a standard practice or not. We see us as having been doing record-based capping or record-based adjustments in the past where a value seems to be anomalous or off in some way. But regardless, commerce is permitted to change its practice if it gives an explanation of what it's doing. And commerce did explain here that it was making this adjustment because the value of the direct byproducts, ammonium sulfate and, I'm sorry, ammonia gas and sulfuric acid, were anomalously high compared to the final byproduct. If those values had been correct, they would have never used them to make the final product. They would have sold the direct byproduct instead because it was worth far more under those surrogate values. So they decided these values must not make sense. So we'll use the value of the downstream byproduct instead. So that was one of their explanations. Their other explanation is that there was- Just to be clear about what's in my head, it seems to me that's an extremely good explanation for not directly valuing the ammonium gas and the sulfuric acid. But that doesn't yet say anything about how to choose between two different ways of solving the problem. Capping or take the ammonium sulfate and subtract production costs. What did commerce say about that choice, not the threshold choice? Well, the capping that they refer to is- I'm not sure that it's a different methodology as the court's looking at it. In those cases, the court is doing things like saying, OK, the scrap byproduct is worth more than the initial input. That doesn't sound right. So instead, we're going to limit you to the value of the initial input. It's doing the same sort of thing that it's doing here. It's making a choice that it's going to limit the value to a certain other number that seems more sensible under the circumstances. And Yuria, what actual evidence is there that could reasonably support the finding that there was some Yuria production in the Philippines in the relevant time period? Well, commerce, as the court has noted, initially came down the other way on this issue. And it pointed to this document that said 92% of Yuria is imported. And it drew the conclusion from that that there was no domestic Yuria production. And the CIT said, that seems wrong. There's 8% there that you're not accounting for. And so commerce recently went back and looked at that and realized that that was right. And it drew data from the record. And of course, commerce doesn't make the record. It's the party's responsibility, as the CIT noted. But it looked at the evidence in the record. And it concluded that it should use these BAS numbers, the Bureau of Agricultural Statistics numbers, which it had decided in the past were specific to Yuria. Now, these numbers, somehow, the actual document is not in the appendix. But it is a public document that was submitted in the proceeding at the agency with a letter dated January 17, 2012. And it's very clear from that document that commerce's earlier determination that it references that that data is at least specific to Yuria. Now, the issue of domestic production. What document, again, is this? I'm sorry. It's a document that is not in our appendix. But it is discussed in the record. It's in the record, the document itself? It's in the record of the proceedings in front of the CIT. I'm sorry, in front of commerce. But it's a public document submitted on January 17, 2012. And was that made part of the record before the CIT, the administrative record before the CIT? I believe so, Your Honor. And in any event, it's discussed that it's clear to the agency that Yuria is part of the numbers in the BAS data. So that's one of the issues. Does that data actually include Yuria? Commerce references its earlier determination that it did. And there's no question about that. The other issue is the conclusions they're drawing about whether this data is domestic or imported. And as we went through in our briefs, you can draw conclusions from the articles to see that there is some domestic production of Yuria. It's not the best, clearest. You weren't going to say not the best available evidence. No. I mean, it's not the easiest to discern from the articles in the record. But it is something that you can derive from that information to see that there is domestic production of Yuria. And so Commerce made a reasonable determination to use these numbers. And of course, the issue is, could a reasonable mind decide that this was the best available data? And the court properly concluded that it was. Thank you very much. And we're here. Can you supply us the document you referred to? Absolutely. Should I file it? Yes, file it with the court. Yeah, that's fine. You'll have five minutes instead of the three. Oh, thank you, Your Honors. First, most important factors. Hydrogen is a byproduct. It's not very important. In fact, it's very small. Chlorine, it differs between the two companies. Ji Hang, Ms. Clark's client, makes chlorine. They start with seawater. They have electrolyzers. So they didn't buy very much chlorine. So it's a very small factor for them. It's a byproduct. Kang Tai buys chlorine. It's a big factor. It's probably publicly, right, the whole APO. So electricity is really big. Urea is big. Chlorine is big. Caustic is a pretty big factor. Let's say top three, chlorine, urea. I mean, I'm sure they can address it, too. It's a chemical manufacturing process. So there's also overhead and other factors. So to answer your question, chlorine is a pretty big deal. In the end, though, Commerce used India for chlorine, which is what they sought. Moreover, the Philippines provided 38 of 40. India didn't provide that many values. They weren't on the record. So vis-a-vis the two, Philippines was a better choice. Next, Your Honor asked about capping. So interestingly, you went off on the issue of, is it rational that the downstream byproduct, ammonium sulfate, would be lower priced than the inputs? So remember, we're using surrogate values for these inputs. And one of the inputs is sulfuric acid. The other one is ammonia gas. There's not much of a global market for ammonia gas. It's dangerous. You have to ship it in containers. So the values we find when we look for these values for something like that are very high, like hydrogen. These things are normally piped in a chemical factory, not shipped internationally. And correct me if I have even framed this question incorrectly. My understanding was that Commerce had a very good reason for not measuring the ammonia, valuing the ammonia gas and the sulfuric acid independently. But my understanding also was that that leaves two choices, some kind of capping choice. Forget about whether that's traditional or not. Some sort of capping choice. And then the choice that my understanding is Commerce made, which is look at the actual market value, surrogate value of the ammonia sulfate, figure out how much it costs to produce it out of basically its two ingredients, and subtract that. And what's left is this. So what's the rationale for Commerce having chosen between those two things, both of which are different from directly valuing the ammonia gas? So the ammonia gas and the sulfuric acid were not measured in the ordinary course by these companies, were not booked in their accounting records, the volume of production. What they did is they had pipes coming right off the CYA, the cyanuric acid production facility. And that went straight into the production of ammonium sulfate. And so they didn't know how much production they had. But you can figure out how much there is by looking at how much ammonium sulfate there is. They did a mole weight, molecular weight calculation, and backed into it. But they didn't account for yield loss or anything, nor was it the product that was sold. So in accounting terms, what they were booking in their books and records was the product that was sold, ammonium sulfate. So Commerce has two approaches to this. They can make the byproduct offset based on the volume of production of a byproduct that you roll back to the front end of your process and use to make recycle in your process. Or you can make the byproduct deduction based on a byproduct that you sell. And so here, we had kind of a hybrid, right? We had a product that was produced, ammonia gas, sulfuric acid. And it was used to make one step further a product that was sold. So for a few administrative reviews, we'll use the production approach. We'll just take the quantity produced. Here, they focused on that. And they said, you know, we're using an estimate of what you produced based on this downstream product that you sold. And it also has these value problems. The values are upside down. So why don't we just use the product that you actually sell for which you have hard evidence in the actual data? And then we can assign a value. And that's what they did. And they explained that, I think. And through two remands, they explained this repeatedly. The lower court was satisfied. And I think the record shows all of that. Quickly on the third subject, what is the best evidence for the proposition that there was some urea production in the Philippines  There were domestic prices. The BAS actually tracked and reported prices in the domestic market for urea. So the government agency tracked it. And that's a question that I had about what this BAS really means. Is that a reflection of only domestically produced urea? Or is the BAS, does that include urea that may have been imported, but then is sold in the retail market in the Philippines? Correct. Which? It could exactly. It could very well be the latter. What you're saying. Well, in that case, the fact that the BAS is reporting a market for urea doesn't tell us anything about whether there's any domestic production. No, but it is the domestic price. And commerce's preference is to use domestic prices versus import statistics. Right, but going one step back from that, I understand the argument about price. But in terms of establishing whether there's actually any domestic production of urea, the BAS tells us nothing. Is that correct? It tells us there's significant enough of a market for them to keep track of it and to import. But it just says there's a price. It just says there's a price. Whether it's imported or it's domestic, there's a price. But what's the data to show that, in fact, there's been domestic production? I don't think there needs to be domestic production. I guess that's my argument. Well, that's really your argument, not the BAS. Commerce's preference is for domestic prices versus import statistics. Right, import statistics are HDS categories. They cover goods. And we don't know the quality. Is it chemical quality urea? Or is it agricultural quality urea? We don't know the solution strength or so forth. So commerce, in general, prefers to use domestic prices. Here, they had two sources. And in fact, the numbers are not significantly far apart. Although, because urea is important, it makes a difference for her because urea is very important to her process or a company's process. By many other raw materials. So what is the rationale behind saying, well, let's assume that we've got a, let's assume that the BAS is 100% imported urea. What's the rationale for using the domestic price as opposed to the import price? Since, presumably, someone who's in the Philippines is making the ultimate product is going to be buying it in the import market if the retail price is much higher. That's not the presumption, in fact. A purchaser in the domestic market would have to pay import duties, VAT. And so commerce prefers to use what they can best identify as a duty-free, tax-free domestic price that would be paid by a domestic producer of comparable merchandise. So there's a company that's saying that the BAS is actually stripped out of duties and taxes and that the GTA would, it under-represents what a producer in the Philippines would actually pay for the urea? No, a producer in the Philippines, if they bought imports, would pay duties and taxes. If they bought in the domestic market, they would, presumably, also pay taxes. So the Commerce Department prefers to use a domestic price to reflect the market value to a domestic purchaser. Now, import values suffer from various problems. So commerce has a preference that is reasonable. It's not really been attacked. What's been attacked here is that evidence, which, as your honor said, is thin, tiny, tiny. And in the end, after two remands, on a close call, commerce decided the domestic price is the better one. And there's sufficient evidence for that. So when you get down to it. So explaining to me what you said a moment ago, I think, was that the import price, the GTA, is that it, GTA? Yeah, GTA price is really not representative of what a producer in the Philippines would actually pay for urea. If they were saying, what's the cheapest price we can find for urea? Somebody said the GTA price is X. They would say, whoa, that's not accurately what we would have to pay. Is that what you're saying? So commerce doesn't just look at what's the cheapest price a domestic producer would pay. Think when India is the surrogate country. Most of their imports are from China. So they assume sometimes import prices are themselves look below market and are very low. And when they're trying to construct a fair market value, they're looking first at what is paid in the domestic market from a source that is widely available, published, and represents a large national database. So it's reliable. When I was responding to you, it was your hypothetical that, well, 100% of the BAS data might have been imports, right? That was what you said. So I just took that and assumed it. Now, as I've circled back, I don't think at the end that can be assumed. That is the issue on which there's a tiny bit of evidence, right? So was it 100% or not, I don't think that can be assumed. In fact, my position in my papers is the opposite, because the Philippines government subsidized this industry. I think a domestic industry did grow up. I think the cites that have been made about imports are too old. The data go back to 1987. And so certainly, given a published price that purports to be, from the Bureau of Agricultural Statistics of the government of Philippines, the domestic price, I think that's a perfectly reliable data point for commerce to rely on. Can I just ask, if the Philippines domestic industry was subsidized by the Philippine government, would that be a good price to use for current purposes? Well, they were subsidized to build the industry. The price they pay for their inputs, would it be a good price? So I like to call this dumping metaphysics. We're heavily into how distorted of a market can we have and still use that market. The preference in the Commerce Department, and generally in this theory of non-market economy. We didn't have an argument here that this particular surrogate price shouldn't be used because it was. The site for the subsidies was that in 1987, the government was trying to promote the agriculture industry by building more fertilizer plants. And so it follows that there might later, in 2011, be a reproduction. I think we should move on. Very generous, Your Honor. Thank you very much. Thank you. Thank you. I wasn't sure what rebuttal time would be given. And this speaks both to our argument and to the issue with urea, to remember that the purpose of the non-market economy method, what it's supposed to be doing is determining what a Chinese manufacturer of chlorinated isocyanides, what their production costs would be if China was a market economy. So when we're looking for urea, when we're looking at that producer, what would the producer most likely use? When we're speaking of the whole process of surrogate country, we're like, what country would be most comparable to China? And to not stray away from that concept that China is this major industry. It has specific inputs. And that's what we're looking at in India. We're looking at this major chemical industry that's specific inputs, that has chlorine available, has domestic chlorine. It has more specific inputs for other chemicals domestically available. It has multiple financial statements available. It's a much more comparable surrogate for China in this case. And those facts are on this record. And why we're not telling this court to direct the department to determine India should be selected, we're saying Philippines has enough issues. India needs to be compared. And not compared just on its economic comparability, but really compared. This country has chlorine. This one doesn't. This product is chlorinated isocyanurates. Chlorine is our most important input and has driven the department's decision in surrogate countries multiple times. So that's the main thing that we're asking this court to consider is that this exception exists and the department should be following it. So in an ideal situation in most reviews, a country in the GNI band is a significant producer. They do have available quality of data. But in particular circumstances, like in this one, you're ending up in a country that's not as significant as a producer. And you're relying on a country that doesn't have the best available information. So following this threshold is resulting in results that don't fulfill the statutory requirements the way they should. And so we're asking this court to consider that this is a circumstance that fits that exception. And commerce needs to follow it because this keeps happening over and over again in cases that the department's resulting in a country that happens to be on this list, but it's not providing the best information. It's not complete happenstance that it's on the list, right? I mean, the sequenced process of deciding every so often who should be on the list is, I think,  No, we have pointed out at the beginning of the court. And you're not making a comparison. You're not saying of the six or so countries that were on the list, use the wrong one. You're saying you actually should have used an off-list country. Right. All the parties had an opportunity to look at that list and determine whether a country on that list was going to provide the best available information. The department itself decided that it needed extra information from India because there was lacking information. And so it was between the Philippines and India on here and saying that the Philippines is problematic enough. And just to re-enter it, there is a complete, I mean, the Indian record is not just a few inputs. I think that was referenced by defendant intervenors that the Indian record is at appendix 2372, is most of the GTM imports. The department itself at 1844 put on a labor rate Indian financial statements, chemical weekly. We have a robust Indian record here. And it isn't just chlorine. But again, it's chlorinated isocyanurase. This is critical. It's also five financial statements in India. First one that we argue is subsidized in the Philippines.  that are more specific. Thank you. Thank you. Thank you. I just want to touch for a minute or so on a few of the statements that were made about what evidence was on the record with respect to urea. There was a statement that the lower level court said, well, 92% of urea is imported. The lower court did not say that. And in fact, what the record says is 92% of Philippine fertilizer requirements are imported in 2010, the year before we're looking at here. There's a lot of fertilizer. Urea is one type of fertilizer. Nothing about that statement implies that what's imported is fertilizer, particularly when you combine it with the other statements about what was imported, what was produced domestically, ammonium sulfate, phosphatic fertilizers. The record shows those were produced domestically. Another statement that was made was, well, import data is not good because we don't know what it's used for. It could be used for fertilizer. It could be used for industrial purposes. Well, in fact, we're looking at an industrial use here. And the BAS data is fertilizer sales at the retail level. Can I ask you a question that I guess is prompted particularly by the discussion with Mr. Cannon? Did commerce rest its determination about using the domestic Philippines urea price entirely on a finding that there was domestic Philippines production of urea? Or did it say, in addition or independently, we would use the domestic Philippines urea price, even if every bit of it came into the Philippines from outside the Philippines? In the remand decisions, they rested it totally on the possibility of domestic production. This concept that a domestic price is any price in the market, regardless of what the source of the input is, has come up only in the court litigation. Not in the remand decision, but in subsequent briefing. Can I switch topics and ask you a question that probably I should have asked you before? Describe in a concrete way what capping is. Capping is when commerce determines that because you're dealing with Describe how capping would work with respect to these particular components. The way you would cap it under commerce's normal methodology would be to look at the surrogate value of the inputs into what becomes ammonia gas and sulfuric acid. In this case, the input is urea. Urea is converted to cyanuric acid, producing byproducts of ammonia gas and recovered sulfuric acid. So you have to look to the urea surrogate value. Well, certainly if you're using the imported surrogate value, you're below the value of ammonium sulfate. So in capping, they would have capped it at the level of the surrogate value for urea. They would have just taken the volume produced of ammonia and the volume produced of recovered sulfuric acid and valued those using, essentially, the urea surrogate value. If you had more than one significant input in, you'd average the input's values. Here, you only have the one. You have urea. OK, I hope that answered it. Good. To get back to continue with the byproduct, one of the things we said, well, yes, they use a chemical formula, but they don't really know. Well, they do know. The chemical formula, it's a molar base. It's molecular. And commerce has no problem with it, because they continue to use molecular formula to determine Jehang's other two byproducts, which also are not directly sold, but are used to produce other products. And with that, I'll conclude. Thank you, and thanks to all counsel. The case is submitted.